***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee on January 30, 2001, the alleged date of injury.
2. The employer is self-insured and the servicing agent is Sedgwick CMS, Inc.
3. This is an accepted claim and plaintiff's average weekly wage was $590.40, and her weekly compensation rate was $393.62.
In addition, the parties stipulated into evidence a packet of documents which was submitted after the hearing. The written stipulation accompanying the documents indicated that records of the North Carolina Medical Board relating to Dr. Rosner were being stipulated into evidence.
The Pre-Trial Agreement dated February 3, 2003, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty-four years old and a college graduate at the time of the hearing before the Deputy Commissioner. Plaintiff began working for defendant in approximately January 1999 as a public health nurse in the county health department. She was assigned to work on the pediatric team, but she would occasionally have to work in other areas as the need arose. Her regular job involved screening children and giving them immunization shots.
2. On January 30, 2001 plaintiff sustained a compensable injury by accident at work. As she was walking to get a band-aid for a child, she slipped on some powered baby formula and fell backwards, striking her head. Her co-workers called an ambulance because she indicated that she could not get up. Her left knee was painful and she had a headache. She denied losing consciousness when questioned by ambulance personnel, but she later could not remember all of the details of what had happened when the emergency room staff asked her for a history of the events. On examination in the emergency room, she had slight swelling over the left occipital area but no tenderness of her cervical spine. She would not consent to have a CT scan of her head performed, presumably because she did not believe that she had sustained that severe of a head injury. The emergency room physician or physician's assistant diagnosed her with a concussion and a soft tissue injury to the left knee and recommended that she follow-up with an orthopedic surgeon.
3. On January 31, 2001 plaintiff went to Dr. Appert, an orthopedic surgeon who had previously treated her for unrelated problems. By that time she had developed tenderness in her mid cervical spine area. He ordered x-rays of her cervical spine which showed degenerative disc disease at C5, but her neurological examination was negative. Consequently, he diagnosed her with a cervical sprain. Plaintiff also complained of left knee pain and pain in her coccyx area, since she had landed on her buttocks. X-rays of the knee were negative and she did not appear to have coccydynia, so Dr. Appert ordered symptomatic therapy. He also allowed her to return to work the next day.
4. It appeared that plaintiff did return to work the next day, although the record was not clear on that point, and she worked most of the next month, missing some time due to complaints of problems with her knee. She returned to Dr. Appert on February 12 and February 27, 2001 with her primary complaint being pain in the left knee. The doctor ordered an MRI which appeared to show a tear of the medial meniscus, so he recommended arthroscropic surgery. The surgery was performed March 6, 2001. Dr. Appert did not find a meniscus tear during the operation, however. There was just some chondromalacia of the patella. He subsequently examined her in follow-up on March 19 and on April 27 when he released her to return to work without restrictions. Plaintiff did return to her regular job at the health department.
5. Although neither a Form 60 nor a Form 21 agreement was submitted to the Industrial Commission, defendants did admit liability under the Workers' Compensation Act for plaintiff's injury of January 30, 2001 and paid temporary total disability and medical benefits.
6. After plaintiff returned to work, she performed her normal job duties as a health nurse. There were some occasions when she complained of leg pain and she was allowed to sit at a desk for a while, but she did not complain of unusual headaches, neck pain or problems with her memory. Dr. Appert saw her in June and July 2001 for her knee pain and referred her to physical therapy. Her symptoms improved with the exercise and therapy provided. Plaintiff then did not see him for the remainder of that year. However, in approximately October 2001 she began seeing Dr. Vaughn, another orthopedic surgeon who had been recommended by a doctor she had previously worked with, and Dr. Vaughn treated her with physical therapy and Synvisc injections. Defendant would not authorize the physical therapy he prescribed until February 2002. When plaintiff began undergoing the therapy, she developed increased pain to the point that she felt that she was unable to continue with her functional activities. On February 11, 2002 she returned to Dr. Vaughn who ordered an MRI. The MRI did not reveal significant pathology. Dr. Vaughn then advised plaintiff to see a specialist for complaints of back and leg pain, and he took her out of work.
7. Plaintiff retuned to Dr. Appert on March 12, 2002 and he noted that she was complaining of pain in her cervical spine again, as well as pain in her hip and her back, so he ordered MRI's of both her cervical and lumbar spine. The tests revealed degenerative disc disease in both areas of her spine with marked degeneration of C3, 4 and 5 and with a small cervical disc protrusion at C5-6 which was not encumbering the neural elements. After reviewing the films, Dr. Appert concluded that plaintiff did not have operative disc disease. On April 9, 2002 he released her to return to work at full duty and advised her to work on strengthening her back and neck. She was not satisfied with his recommendations and on April 10 went to Dr. Allen, a neurosurgeon, for another opinion. He and his physician's assistant noted her chief complaint to be posterior buttock pain with some associated lateral leg pain. She also had limitation of motion of her neck with quite a bit of neck spasm and she reported three instances of pain radiating down her left arm, but that was not a major concern. The doctor reviewed her MRI and interpreted it as showing minor desiccation of the L4-5 disc but no herniation or nerve root compression. He recommended physical therapy and perhaps some trigger point injections. Plaintiff did undergo the physical therapy he recommended.
8. However, plaintiff was very dissatisfied with the evaluation by Dr. Allen, who apparently allowed his physician's assistant to do most of the work. She felt that her symptoms were worsening and she had begun to notice that she was having problems with her memory. On April 18, 2002 she went back to Dr. Appert who talked with her at length about getting reconditioned despite her pain. It was his opinion that the pain she was feeling was real but that she was not reacting well to it, and that the condition of her cervical spine was not operative. Consequently, he thought that she should be as active as possible and return to work.
9. At some time after she stopped working in February 2002, plaintiff underwent surgery for a bunion and she was kept out of work for that condition, which was unrelated to the injury in question, for a longer period than Dr. Appert kept her out of work with her knee. Believing that there was a undiagnosed physical problem causing her worsening symptoms, plaintiff consulted with her attorney and then scheduled an appointment with Dr. Whitmer, an orthopedic surgeon, on April 29, 2002. Dr. Whitmer examined her on that date and reviewed her MRI. His interpretation of the test was quite different than that of Dr. Appert because he considered the disc herniation at C5-6 to be relatively large and thought that her cervical canal was quite narrow, so he ordered an epidural steroid injection. At the next follow-up appointment on May 16, Dr. Whitmer concluded that plaintiff's findings were consistent with considerable pressure on her spinal cord and the nerves in her neck. The doctor's wife had had a similar problem, so Dr. Whitmer referred plaintiff to his wife's doctor, Dr. Rosner, a neurosurgeon in Hendersonville. He also ordered an MRI.
10. Dr. Rosner and his assistant examined plaintiff on June 13, 2002. In the meantime, plaintiff had gone to the emergency room on May 29, 2002 with complaints of severe pain and slurred speech. She informed Dr. Rosner's physician's assistant that her symptoms had developed gradually until May 29 when they suddenly became severely worse. At that time she was complaining of pain throughout her body, numbness on her left side, problems swallowing, problems with memory and cognition, periodic sensations as though she were about to faint, severe headaches, neck pain and problems with her balance. On examination, there were findings consistent with abnormalities in the brain stem or cervical spinal cord. In addition, the MRI performed on June 12, 2002 showed tonsillar descent of the brain stem, primarily on the right side. Dr. Rosner diagnosed plaintiff with hypoplastic posterior fossa, a more current name for what has historically been called a Chiari malformation. The condition involves the protrusion of part of the brain stem into tonsils at the top of the spinal canal. It would have been present since birth or childhood.
11. To verify his diagnosis, Dr. Rosner ordered a tilt table test, which was subsequently performed and which generated a strongly abnormal response. Based upon the test results, Dr. Rosner concluded that plaintiff's symptoms were physical and not psychological. Since she had told him that her symptoms had started with her fall at work and since symptoms induced by trauma usually would improve on their own, Dr. Rosner recommended that they wait and watch how she progressed before considering surgery. However, plaintiff returned to Dr. Whitmer less than a week later on an emergency basis. She was so weak that she was using a wheelchair, she could not eat and she was in a great deal of pain. Consequently, Dr. Whitmer sent her back to Hendersonville where she was admitted to the hospital under the care of Dr. Rosner's physician's assistant and Dr. Flechas, since Dr. Rosner was out of the state at the time. Dr. Flechas ran tests to rule out other potential causes for her symptoms.
12. Once Dr. Rosner returned and plaintiff's condition had stabilized, he performed surgery on June 25, 2002 to decompress the affected section of the brain stem. Following the operation, plaintiff reported improvement of her symptoms. Dr. Rosner did not see her in follow-up until September, after she had been hospitalized for treatment of depression. Chronic pain had been an issue with her mood disorder. However, on September 26, 2002 when she saw Dr. Rosner, she reported improvement with swallowing, balance, memory, and cognition and said that her headaches were less frequent. On examination, her corneal and gag reflexes had returned. Despite the improvement, she was still having significant symptoms. Some of her symptoms appeared to be more localized and associated with problems in the lower cervical spine, so Dr. Rosner ordered an MRI which he interpreted as showing narrowing at C5-6 with a bone spur. He then recommended surgery.
13. On October 16, 2002 Dr. Rosner performed surgery to decompress and fuse the C5-6 interspace. At the follow-up appointment on October 29, plaintiff reported considerable improvement in her left arm pain, but she developed some interscapular pain by the next office visit on December 9, 2002. Apparently Dr. Rosner or his assistant saw her again in January but the findings from that evaluation were not placed into evidence. As of the date of hearing, she was still wearing a brace and was reporting significant upper body weakness. Her follow-up with Dr. Rosner was complicated by the fact that his license was suspended for periods of time associated with an investigation by the North Carolina Medical Board into his practice of performing operations such as the first surgery he had performed on plaintiff. Consequently, there were times when he could not see her as a patient. His license was suspended as of the time his deposition was taken.
14. Defendants have denied liability for the symptoms plaintiff developed associated with the Chiari malformation diagnosed by Dr. Rosner. The condition would have been preexisting in that plaintiff would have had it since birth or childhood. In most patients, symptoms from this condition develop gradually without trauma. Sudden deterioration of symptoms occurs in only approximately five percent of patients and can occur spontaneously or due to trauma. Extension of the neck due to dental work or surgery can also trigger symptoms.
15. In this case, plaintiff has maintained that her symptoms started immediately after her fall, that they progressively worsened and that she was having obvious problems with memory, headaches and neck pain as of February 2002. Basing his opinions on what plaintiff had told him, Dr. Rosner assumed those facts were accurate and also assumed that her symptoms had been severe enough that she was unable to work for most of the time after her fall. However, in fact, plaintiff had returned to work within a few days after her fall and had worked for the next year, except for the time Dr. Appert took her of work for knee surgery, and she had not complained of any symptoms at work except for leg pain. There were no indications that she was having problems with memory or cognition until she tried to return to work after her bunion surgery in March or April 2002 when she appeared to be sedated. Plaintiff's testimony that she reported these symptoms before February 18, 2002 when she left work was not accurate. The earlier conversation had dealt with plaintiff's problems with excessive tardiness, with making too many personal telephone calls and with wrapping gifts at work.
16. Rather than becoming symptomatic with Chiari malformation type of symptoms immediately after her injury, it was over a year later before plaintiff began to report and exhibit those symptoms. She had bunion surgery in February or March 2002. The evidence did not address whether she had dental work during that time. In any event, the facts which Dr. Rosner assumed were materially inaccurate and he indicated that his opinion regarding causation was based upon the history she gave him and the assumption that her symptoms started at the time of her fall. At the hearing, plaintiff stated that she really did not remember much of what had happened in the previous two years due to the cognition problems which she had developed. She was therefore not a good historian. Although she indicated that she kept some sort of journal, the journal was not offered into evidence.
17. Since the facts upon which Dr. Rosner and Dr. Whitmer based their opinions were materially inaccurate, plaintiff did not prove that the symptoms she developed as a result of her Chiari malformation (or hypoplastic posterior fossa) were a proximate result of her injury by accident on January 30, 2001. Although a fall such as she sustained could aggravate the condition, she did not prove that the fall probably did aggravate it in view of the lengthy delay in the development of her symptoms.
18. Plaintiff did prove that she sustained an injury to the C5 area of her cervical spine as a result of her fall on January 30, 2001. Although Dr. Appert did not note complaints of neck pain or stiffness after January 31, 2001, he remembered that she continued to complain of symptoms throughout the time he treated her for knee problems. He had simply noted the "squeaky wheel" symptom, which was her knee pain. However, it was his opinion that she did not have an operative condition in either her cervical or lumbar spine. Furthermore, the neck symptoms were so minor that they did not warrant treatment for a year. Dr. Allen agreed that there was no nerve root compression and that surgery was not advisable. Defendant has disputed the unauthorized treatment plaintiff later sought on her own from Dr. Whitmer and Dr. Rosner. Both of the doctors initially treated her primarily for the Chiari malformation symptoms, which became quite disabling and serious by May 2002. Although plaintiff did injure her neck and low back as a result of her fall at work, the symptoms she experienced were not disabling and her condition did not warrant the surgery that Dr. Rosner performed in October 2002. Plaintiff did not prove that that surgery tended to effect a cure, give her relief or lesson her disability from the injuries she sustained in the accident.
19. Plaintiff sustained a compensable injury by accident on January 30, 2001 when she fell at work. As a result of the accident, she sustained injuries to her left knee, to her head and to the C5 area of her cervical spine as well as a low back strain. She had preexisting degenerative disc disease in both her cervical and lumbar spine but her fall caused her to develop pain in both of those areas. Due to the fall and her subsequent knee surgery, she was rendered unable to work for a day in January and for four to six weeks beginning with her surgery on March 6, 2001. Defendant admitted liability for her injury and paid compensation to her for temporary total disability, and she has neither contended nor proven that there were any periods of time through April 2001 when she did not receive compensation while she was out of work.
20. Due to worsened leg, back and neck pain, plaintiff again became unable to perform her regular work duties on February 11, 2002 and she was unable to work beginning February 19, 2002 until Dr. Appert released her to return to work effective April 11, 2002 the day after she saw Dr. Allen. Although she thereafter received some physical therapy ordered by Dr. Allen, she was capable of performing her regular job duties with defendant-employer insofar as the injuries she sustained on January 30, 2001 were concerned. Any disability after that date was due to her Chiari malformation symptoms which were not proven to have been caused or materially aggravated by her fall at work.
21. Plaintiff reached maximum medical improvement with respect to this injury by accident by April 18, 2002. She sustained a two-percent permanent partial disability to her left leg as a result of the accident and no permanent partial disability to her back.
22. Findings have previously been made regarding the medical treatment rendered by Dr. Rosner. In addition, plaintiff was treated for depression beginning in September 2002. However, to the extent that it was related to chronic pain, her depression was due to her Chiari malformation symptoms which were much more serious and debilitating than the symptoms resulting from her injury.
23. Defendants have failed to provide any excuse or reason for their failure to submit a Form 60 or Form 21 agreement to the Industrial Commission in this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As a result of the compensable injury by accident occurring on January 30, 2001, plaintiff injured her left knee, her low back and the C5 area of her cervical spine. However, she did not prove that her preexisting Chiari malformation was materially aggravated by the accident. N.C. Gen. Stat. § 97-2(6); Click v.Pilot Freight Carriers, Inc., 300 N.C. 164 (1980).
2. Plaintiff is entitled to compensation for temporary total disability at the rate of $393.62 per week for seven and 3/7th weeks for the additional disability she sustained beginning February 11, 2002 as a result of this injury by accident. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to compensation at the rate of $393.62 per week for four weeks for the two-percent permanent partial disability she sustained to her left leg as a result of this injury by accident. N.C. Gen. Stat. §§ 97-31(15) and (19).
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident to the extent that it was provided by her authorized treating physicians. In addition, since plaintiff was entitled to a second opinion, she is entitled to have defendant provide the examination by Dr. Allen. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. However, the treatment by Dr. Whitmer and Dr. Rosner was not found to be rendered for the conditions plaintiff sustained as a result of this injury. Consequently, she is not entitled to have defendants provide that treatment. Nor is she entitled to have them provide the treatment for her depression which was also not causally related to the injury in question. N.C. Gen. Stat. §§ 97-2(19); 97-25; Click v. Pilot Freight Carriers, Inc.,300 N.C. 164 (1980).
6. Defendants did not comply with the Workers' Compensation Act and Industrial Commission Rules by their failure to submit an appropriate form accepting liability for this claim to the Industrial Commission. Having failed to provide reasonable excuse for their failure to comply with the law, sanctions should be assessed. N.C. Gen. Stat. § 97-18(b); Worker's Compensation Rules of the North Carolina Industrial Commission.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $393.62 per week for seven and 3/7th weeks for her temporary total disability. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay compensation to plaintiff at the rate of $393.62 per week for four weeks for her permanent partial disability. This compensation has also accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident from authorized treating physicians and Dr. Allen. However, defendants are not liable for the treatment rendered by Dr. Whitmer and Dr. Rosner and for plaintiff's depression.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Mr. Lucas.
5. Defendants shall pay sanctions in the amount of $750.00 to the Industrial Commission for their failure to submit a proper form admitting liability for this claim.
6. Defendants shall pay the costs.
This the 31st day of March, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER